UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JALALUDDIN ACHAKZAI,

Plaintiff,

v.

NANCY A BERRYHILL,

Defendant.

Case No. 18-cv-07005-JCS

**ORDER RE MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 15, 17

## I.      INTRODUCTION

Plaintiff Jalaluddin Achakzai brings this action appealing the final decision of Defendant
Andrew Saul, Commissioner of Social Security (the "Commissioner"),[1] to deny Achakzai's
application for disability benefits.  The parties have filed cross motions for summary judgment
pursuant to Civil Local Rule 16-5.  For the reasons discussed below, Achakzai's motion is
GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further
proceedings.[2]

## II.      BACKGROUND

Achakzai is an approximately fifty-eight-year-old former chef and military interpreter with
a high school education.  Administrative Record ("AR," dkt. 14) at 80.  He alleges disability due
to hypertension, hyperlipidemia, insomnia, prediabetes, bilateral tinnitus, and post-traumatic stress
disorder (PTSD).  AR at 205.  The alleged onset date of his disability is August 1, 2012.  *Id.*

---

[1] Andrew Saul was confirmed as Commissioner while this action was pending, and is therefore
substituted as the defendant as a matter of law.  *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all
purposes pursuant to 28 U.S.C. § 636(c).

1

## A.     Medical Records

2      Achakzai is only challenging the Administrative Law Judge's ("ALJ's") severity

3   determination regarding his post-traumatic stress disorder, major depressive disorder, and panic

4   disorder.  *See* Pl's Mot. (dkt. 15).  Accordingly, this summary of Achakzai's medical records does

5   not include records pertaining to his tinnitus, hypertension, or other physical medical problems

6   except as they relate to his claim of PTSD.  It is not intended to be a complete recitation of

7   Achakzai's medical history.

8      Achakzai was born in Afghanistan.  AR at 34.  Immigration records indicate that he was

9   born on January 1, 1962, but Achakzai estimates that he is older than his recorded age because of

10  differences in record keeping between Afghanistan and the United States.  *Id*. at 33.  Achakzai

11  immigrated to the United States when he was 28 years old.  *Id*. at 322.  Achakzai has eight

12  children, the youngest four of whom live with him.[3]  *Id*.

13     Achakzai's past work includes being a restaurant owner, a chef, and a translator for the

14  United States Military in Afghanistan.  *Id*. at 212.  He served as an interpreter in Afghanistan

15  twice: once in 2004 and again in 2009.  *Id*.  During his first stint in Afghanistan, he accompanied

16  the military on their missions, where he encountered battlefield dangers including  "[a]mbushes,

17  I.E.D., and gun fire."  *Id*. at 223.  Achakzai reported that the Taliban retaliated against his family

18  because of his association with the United States, killing four of his brothers.  *Id*. at 40.  Achakzai

19  also witnessed car bombings, dismemberments, torture victims who had been skinned alive, and

20  his nephew's death.  *Id*. at 360.  According to his daughter, when he returned "he was a changed

21  man."  *Id*.

22     When he returned to the United States after his first tour in Afghanistan, he attempted to

23  open a restaurant with his cousin as his partner.  *Id*. at 360.  Achakzai left the restaurant industry

24  after his partner underhandedly persuaded him to transfer ownership of the restaurant.  *Id*. at 223.

25  He decided to return to Afghanistan as an interpreter a second time in 2009, motivated by that

26  financial loss.  *Id*. at 40, 360.  In 2012, he was injured and hospitalized.  *Id*. at 42.  By the time he

27

28  _____
[3] Another source reported that Achakzai has six children.  AR at 341.  However, "two of his children were missing for years."  *Id*. at 362.  This may account for the discrepancy.

had recuperated, his team had left Afghanistan. *Id*. He returned to the United States with no job and no insurance benefits. *Id*. According to Achakzai, this is when his depression began. *Id*. at 42–43; *see also id*. at 66 (alleging an onset date of August 1, 2012).

Achakzai sought treatment for his declining mental health three years later, when he told his primary care physician Dr. David Lee about his time in Afghanistan. *Id*. at 304.

On a function report dated June 12, 2015, Achakzai described the symptoms that he claimed caused his disability:

> I have anxiety and my doctor said it's sign of PTSD from working with military overseas. I am not able to sleep even with the help of sleeping medicine from my doctor. I feel suffocated and stressed and worried all day/night. . . . I can't do anything physical because of the pain and anxiety in my body. I spend time with my grandson and other times I am watching news on computer or TV.

*Id*. at 224–25. Achakzai claimed the he was no longer "active" or "social," that he preferred to be alone, and no longer enjoyed "anything." *Id*. at 225–26. He linked his symptoms to his time in the military, reporting stress and anxiety since his return from his work as a translator. *Id*. at 227. He did not go out, and only went outside when his children made him go to a park about once per month. *Id*. While his son took him to the mosque for prayer on Fridays, he did not participate in the services. *Id*. at 228. His only hobby was watching the news, which made him worry about his family back in Afghanistan. *Id*.

Achakzai also detailed physical limitations affecting lifting, squatting, bending, standing, walking, sitting, kneeling, talking, hearing, stair-climbing, seeing, memory, completing tasks, concentration, understanding, and using his hands. *Id*. at 229. He reported that he could walk for thirty minutes before needing to rest but did not continue walking when he stopped. *Id*. He indicated that he did not complete tasks, and that although he could follow spoken instruction "OK," he could not follow written instructions "at all." *Id*. He noted that, while he got along "good" with authority figures, he did not handle stress or changes in routine well. *Id*. at 230. He was "stressed constantly, worried and [got] anxiety attacks." *Id*. at 230.

Achakzai listed his medications and their side effects: he was taking 50mg of Trazodone, which caused nightmares and insomnia, and 10mg of Amlodipine Besylate and 50mg of

Hydrochlorothiazide, both of which caused dizziness. *Id*. at 231. He concluded his self-assessment by explaining:

> Working with military overseas in Afghanistan and the experiences I went through have really affected my life. I have witnessed a lot of my teams members lose their lives of body parts which I can't never forget. I have anxiety and loss of sleep and the little sleep I get I have nightmares and I wake paniked [sic] and sad.

*Id*.

His son, Tawab Achakzai, completed a third-party function report for his father. *Id*. at 233–42. Tawab wrote that his father "look[s] sad always and fragile and keeps to himself most of the time, watches to [sic] much news." *Id*. at 233. According to Tawab, Achakzai spent all his time watching television news. *Id*. at 234. Tawab noted that, since his illness, his father was no longer active or social. *Id*. Tawab also explained that his father had trouble sleeping. *Id*. at 234. Even though Achakzai used to be a chef, Tawab reported that his father had "[n]o interest" in cooking or preparing meals and did not prepare his own meals. *Id*. at 235. Achakzai did not go out alone—Tawab "[took] him everywhere." *Id*. at 236. According to Tawab, Achakzai spent all his time watching TV news, and his kids would "talk and spend time with him" because he was always at home. *Id*. at 237. Tawab took his father to Friday prayers, but he needed accompaniment and reminder to go. *Id*. Once there, he prayed but kept to himself, not engaging in conversation with the other worshipper at the mosque. *Id*. Since his father's illness began, Tawab wrote, Achakzai was "[n]ot social at all and would rather keep to himself." *Id*. at 238.

Tawab echoed his father's assessment of his physical limitations. *Id*. at 238. He wrote, "I believe what he went through in Afghanistan and what he saw has affected in life traumatically." *Id*. He linked his father's blood pressure problems to his poor ability to handle stress. *Id*. at 239. Tawab noted "[h]e looks constantly worried and very dissapointed [sic] in himself." *Id*.

Achakzai sought treatment for his declining mental health on April 2, 2015, when he told his primary care physician Dr. David Lee about his time in Afghanistan. *Id*. at 304. Dr. Lee diagnosed Achakzai with insomnia and proscribed trazodone, noting, "Pt has component of PTSD. Was in Afghan army. Wakes up thinking about it." *Id*. Achakzai previously asked Dr. Lee whether he could qualify for Social Security Disability Insurance based on his hypertension on

4

December 8, 2014. *Id*. at 300. Dr. Lee said, "I don't think he qualifies." *Id*. On August 3, 2015, when discussing Achakzai's diagnosis of "[d]epression with anxiety," Dr. Lee noted that Achakzai "[w]ants to start with medication and consider therapy in future." *Id*. at 329.

Psychologist Dr. Patricia Spivey saw Achakzai for a mental status disability report on August 18, 2015. *Id*. at 322. Achakzai was accompanied by his son. *Id*. He only spoke Pashto and used an interpreter to talk to Dr. Spivey; "he said that he has forgotten a lot of words in English recently." *Id*. at 322–23. Achakzai told Dr. Spivey:

> [H]e had no history of psychiatric treatment until recently. He sought medications for depression and anxiety. He said that he has trouble sleeping. He is having memories of the war sounds and bombings, etc. He said that he had hallucinations, but when I asked him to describe those, he was describing paranoid ideas such as fearing that someone is wanting to kill him. He denied suicidal ideation. He is not on any form of therapy. He said that he has been taking the Paxil about one month; he is not feeling any effects of it and he does not think it has helped him.

*Id*. at 323. She assessed Achakzai's symptoms as "mild to moderate" and his prognosis as "[g]ood with continued treatment." *Id*.

Dr. Spivey offered her opinion as to Achakzai's work-related abilities. *Id*. at 323–24. According to Dr. Spivey, Achakzai had mild to moderate impairments in his ability to maintain emotional stability and predictability and mild impairments in his ability to maintain adequate pace or persistence to complete one to two step simple repetitive tasks, maintain adequate pace or persistence to complete complex tasks, maintain adequate attention and concentration, adapt to changes in job routine, and ability to withstand the stress of a routine work day. *Id*. She further found that Achakzai had no impairments in his ability to follow simple and complex instructions, verbally communicate effectively with others, communicate effectively in writing, and interact appropriately with co-workers, supervisors, and the public on a daily basis. *Id*. Dr. Spivey gave Achakzai a GAF score of 65. *Id*. at 323.

On November 3, Dr. Lee wrote that Achakzai was experiencing "[o]nly minimal improvement with paxil. Still waking up with panic attacks in the middle of the night." *Id*. at 328. In a disability benefits interview dated November 17, 2015, Achakzai told interviewer C. Monterrosa that his condition had worsened since his original disability application. *Id*. at 245.

Dr. Lee completed a General Residual Functional Capacity Questionnaire on December 15, 2015. *Id*. at 335–36. He diagnosed Achakzai with "PTSD, depression, anxiety" and opined that his prognosis was "Poor." *Id*. at 335. According to Dr. Lee, Achakzai would be absent from work "[m]ore than four days per month" due to his symptoms. *Id*. Dr. Lee also indicted that Achakzai's "experience of fatigue or other symptoms" would "[f]requently" be "severe enough to interfere with attention and concentration needed to perform even simple work tasks." He noted that "emotional factors" contributed to Achakzai's symptoms and limitations, and that Achakzai's condition would have both good and bad days. *Id*. He found that Achakzai's impairments were "reasonably consistent with the symptoms and functional limitations" and that Achakzai was not a malingerer. *Id*.

Dr. Lee checked boxes indicating that Achakzai would be "[s]eriously limited, but not precluded" from maintaining attention for a two hour segment, completing a normal workday and work week without interruptions from his symptoms, performing at a consistent pace without an unreasonable number and length of rest brakes, and being aware of and taking appropriate precautions against normal hazards. *Id*. at 336. He further found that Achakzai was "[u]nable to meet competitive standards" with regard to "[r]emember[ing] work-like procedures," "[s]ustain[ing] an ordinary routine without special supervision," and "deal[ing] with work stress." *Id*. Dr. Lee did not identify limitations in any of the other functional areas listed on the form. *Id*.

State consultative physician Dr. James Kelly evaluated Achakzai's record on September 12, 2015 in connection with his initial application. *Id*. at 72–73. Dr. Kelly wrote: "No mental medically determinable impairments established." *Id*. at 72. Dr. Helen Patterson reviewed Achakzai's record on January 15, 2016 as part of Achakzai's request for reconsideration and found the same. *Id*. at 86–87.

On January 19, 2016, Achakzai saw psychiatrist Dr. Amrit Saini for the first time, seeking help for what he described as "depression." *Id*. at 360. Achakzai told Dr. Saini some of the things he saw when he was in Afghanistan during the war:

> He's [sic] reports that during this time in Afghanistan he saw a lot of people dying . . . bombs blowing up cars, Dead bodies, Limbs separated from bodies, bodies of tortured people who were skinned

> alive. . . . He saw his nephew dying in front of him in the war. He
> also reports [his] brothers died in Afghanistan during this time. . . .
> His daughter reports that the first time he came back from war he was
> a changed man. He became more irritable, sad and tearful. He now
> reports that he has nightmares bombs exploding and people dying. He
> also reports he has flashbacks . . . . He avoids going places, is socially
> isolated and reclusive. He cannot tolerate [loud s]ounds or even
> children crying. He cried profusely during the session and endorsed
> a sad mood he sleeps late wakes up early as [sic] spends all the time
> outside the house.

*Id*. at 360. They also discussed Achakzai's cousin embezzling from him, which led to a financial

situation that forced him to go back to Afghanistan a second time. *Id*. Dr. Saini noted anhedonia,

but no suicidal thoughts or passive death wish. *Id*. He diagnosed Achakzai with "Major

depressive disorder, recurrent episode, moderate degree," "Post-traumatic stress disorder," and

"Panic disorder." *Id*. at 361.

On February 16, 2016, Achakzai told Dr. Saini that his sleep was "better," and that his

mood, nightmares, flashbacks, and crying spells had improved. *Id*. at 358. However, he was also

experiencing "ongoing irritability . . . increased startle, avoidance." *Id*. Dr. Saini also noted that

Achakzai's mother had died. *Id*.

According to Achakzai's son, Achakzai had "no difference" in his symptoms on March 15,

2016. *Id*. at 356. Achakzai explained that, while he slept better when he was alone, being alone

made him "really sad." *Id*. His mood was "5/10" and, while his nightmares had decreased, he

continued to experience "ongoing flashbacks," "ongoing sad-anxious mood," and anhedonia. *Id*.

Dr. Saini thought that Achakzai "would benefit from titration[4] in dose of meds." *Id*.

On April 12, 2016, Achakzai's mood was "5/10," and he "noticed in the last two weeks

that [he had] been feeling better." *Id*. at 354. Achakzai tried not to stay alone because doing so

contributed to his depression. *Id*. He reported an improved appetite and "[r]educed Anhedonia."

*Id*. Dr. Saini opined:

> Pt. appears to demonstrate improving response to prescribed
> medications. There has been reduction in the number, severity of
> nightmares. Pt. is also able to sleep after the nightmare unlike before

---

[4] "Titration is the 'continual adjustment of a dose based on patient response. Dosages are adjusted until the desired clinical effect is achieved.'" *Bruce v. Chaiken*, No. 215CV0960TLNKJNP, 2018 WL 4191871, at *29 (E.D. Cal. Aug. 31, 2018) (citing _https://medical-dictionary.thefreedictionary.com/titration+dose).

> when he was unable to sleep after the nightmare. . . . Pt. would benefit
> from longer trial with current meds.  Better tolerance of side effects
> is expected as time goes on.

*Id*. at 354–55.

Achakzai's son accompanied him to translate for Dr. Saini on June 4, 2016.  *Id*. at 352.
Dr. Saini wrote that Achakzai's mood was "4-5/10," although he was "less frequently tearful."  *Id*.
He reported eating one meal per day "due to low motivation" as well as continued intermittent
anxiety and insomnia.  *Id*.  Dr. Saini also noted that Achakzai would get affected by news about
Afghanistan and worried about his family.  *Id*.

Achakzai was "not doing bad" on August 22, 2016.  *Id*. at 350.  His nightmares had
decreased and he was occasionally sleeping from five to six hours "with the help of Klonopin."
*Id*.  His daughter told Dr. Saini that her parents spent their nights watching the news, listening to
sermons, and praying.  *Id*.  According to Dr. Saini, Achakzai "spoke very little English and could
understand some statements."  *Id*.

On October 3, 2016, Achakzai reported having trouble sleeping.  *Id*. at 348.  His daughter
told Dr. Saini:

> He has a fear that somebody is watching him at night and has fear that
> someone might come in and, might not kill him. . . . My father has
> lost many members of family in his native country. . . . If a small child
> screams in the day time he gets easily startled. . . He only eats one full
> meal in the day time at noon and breakfast is minimum. . . . He has
> stopped walking because his left knee is numb.

*Id*. (internal quotation marks omitted).  According to her, Achakzai spent time reading and
watching movies.  *Id*.  Dr. Saini increased Achakzai's Zoloft to 200 mg per day, increased his
Klonopin to .5 mg in the morning and 1 mg at night, and started him of 50 mg of Seroquel.  *Id*. at
349.

Achakzai reported being "not bad" on November 7, 2016.  *Id*. at 346.  He was again
accompanied by his daughter, who translated.  *Id*.  He was taking his medication and not
experiencing any side effects.  *Id*.  He also "appear[ed] to demonstrate fair response to prescribed
medications."  *Id*.

On February 16, 2017, Achakzai was admitted to the hospital after almost collapsing.  *Id*.

at 376. His son described it as "some type of anxiety attack where he just went motionless and couldn't speak." *Id*. at 53. Achakzai's son testified that the attack was brought on by Achakzai's fear of "losing a daughter" once that daughter married. *Id*.; *see also id*. at 342.

According to the notes of Dr. Alfort Briones Santos:

> [H]e went for a walk at 8:00 am and came home and took blood pressure medications. He was preparing breakfast and then suddenly felt weak and lightheaded. There was no loss of consciousness. . . . [H]is blood pressures have been fluctuating in-house from as low as 107 systolic to as high as 165. . . . I suspect patient's blood pressure is fluctuating too much in the outpatient setting and he came in clinically dry.

*Id*. at 376.

Achakzai returned to Dr. Saini on March 13, 2017 after his ER visit and hospital stay. *Id*. at 342. Achakzai's daughter, again translating, explained that the tests done on Achakzai's heart were normal. *Id*. She told Dr. Saini that her father felt guilty for upsetting the family's plans for an engagement party. *Id*. Since then, Achakzai had traveled to Los Angeles to see his brother, who was undergoing treatment for cancer. *Id*. Achakzai was eating and sleeping "okay" and was "experiencing increasing anxiety and moments of sadness." *Id*. In his notes, Dr. Saini wrote "Pt. appears to demonstrate lower than expected response to prescribed medications. . . . Pt. would benefit from adjusting psychiatric medications and possible therapy in Farsi." *Id*. at 343. Dr. Saini discontinued Prazosin because it may have contributed the near-fainting episode. *Id*. He continued Achakzai's Zoloft, Klonopin, and Seroquel. *Id*.

On March 5, 2017, Achakzai told Dr. Saini "[o]verall I have been doing good." *Id*. at 344. His daughter served as a translator. *Id*. Achakzai reported feeling "good" and that his feelings of anxiety and suffocation were decreasing. *Id*. He was able to drive by himself. *Id*. However, his appetite was "lower than expected" and he still got "upset easily." *Id*. He told Dr. Saini that he was seeking treatment for his leg pain, although he was "walking regularly." *Id*. Achakzai described his mind as "very sensitive." *Id*. In the mental status exam, Dr. Saini noted that Achakzai "ha[d] limited insight due to cultural reservations into mental illness." *Id*. Dr. Saini referred Achakzai for therapy in Farsi. *Id*. at 345. His sleep was improving, but his anxiety increased when he heard anything about Afghanistan. *Id*. He also prayed every day. *Id*. Every so

often, Dr. Saini noted, Achakzai would smile. *Id.* Dr. Saini increased Achakzai's dose of Seroquel to "200 mg at night." *Id.* According to his daughter, Achakzai was planning a trip to Germany to visit his brother.[5] *Id.*

Dr. Saini wrote a letter on Achakzai's behalf dated May 5, 2017. *Id.* at 362–63. In Dr. Saini's opinion, Achakzai's current symptoms were caused by his time in Afghanistan: "As per his report four of his brothers were allegedly murdered during the war. Also reportedly two of his children were missing for years. . . . Mr. Achakzai witnessed countless killings, witnessed the deaths of his team members and also endured lot of stress in his work." *Id.* at 362. Dr. Saini opined that Achakzai's trauma affected him interpersonally and psychosocially. *Id.* He also noted that Achakzai always brought one of his adult children to appointments. *Id.* In addition, Dr. Saini wrote:

> He continues to experience full syndrome of major depression, high persistent anxiety state with frequent panic episodes and major symptoms of posttraumatic stress syndrome as social avoidance, depressed and labile mood, spontaneous irritability, recurrent insomnia associated with nightmares of traumatic events and flashback experiences. His daily biological and social functioning is significantly affected by his persisting symptoms such that quality of life is significantly affected negatively. Feelings of guilt and worthlessness continue to haunt him. Mr. Achakzai continues to experience increase in arousal and emotional reactivity with symptoms of anxiety and panic.
>
> At present his psychiatric symptoms are only partially controlled with non-sustained improvement and repeated worsening of all symptoms of mood, anxiety, insomnia and PTSD with stresses of daily life. With continuing psychiatric symptoms it would be very difficulty [sic] for him to have sustained attention, concentration and mental ability to allow him participate in useful work related activities.

*Id.*

Dr. Saini also completed a mental impairment report. *Id.* at 364–66. He described Achakzai's response to treatment as "moderate . . . with frequent relapses." *Id.* at 364. He checked boxes indicating that Achakzai was experiencing depressed mood, diminished interest in

---

[5] According to his motion, Achakzai did not go to Germany. Pl's Mot. at 18 ("If the record is updated, it will emerge that the trip did not happen."). Whether the trip occurred is not relevant to the outcome of the present motions.

almost all activities, appetite disturbance with change in weight, sleep disturbance, observable psychomotor retardation and agitation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, "passive" thoughts of death or suicide, distractibility, anxiety with restlessness and easy fatigue, irritability, "[p]anic attacks followed by a persistent concern or worry about additional panic attacks or their consequences"; "[i]nvoluntary, time consuming preoccupation with intrusive, unwanted thoughts"; qualitative deficits in nonverbal communication and social interaction; a pattern of detachment from social relationships; "[e]xposure to actual or threatened death, serious injury, or violence"; involuntary re-experiencing a traumatic event; avoidance of external reminders of the event; disturbance in mood and behavior; and increases in arousal and reactivity. *Id*.

In Dr. Saini's opinion, Achakzai had "Extreme" limitations in all four of the paragraph B areas: ability to understand, remember, and apply information; ability to interact with others; ability to concentrate, persist at tasks, or maintain pace over the course of an eight hour work day; and the ability to adapt or manage himself ("Ability to Regulate Emotions, Control behavior, and Manage One's Well-being at Work"). *Id*. at 365. Dr. Saini estimated that Achakzai would miss "more than four days [of work] per month." *Id*. at 366. He noted that Achakzai's symptoms had been this severe for "more than one year." *Id*.

The record also includes several letters, certificates, and photographs from Achakzai's time working as a linguist in Afghanistan. *Id*. at 368–73.

### B. Initial Denial of Application

Achakzai filed his initial application for disability benefits on May 1, 2015. AR at 66. It was denied on September 14, 2015. *Id*. at 98. He requested reconsideration on November 13, 2015. *Id*. at 95. That, too, was denied on January 28, 2016. *Id*. at 106. Achakzai filed a written request for a hearing on March 10, 2016. *Id*. at 111.

### C. The Administrative Hearing

ALJ Arthur Zeidman held an administrative hearing on June 8, 2017 in Oakland, California. AR at 28. Because Achakzai speaks Pashto, Mohammad Azizi served as a translator. *Id*. Through the translator, the ALJ explained the disability determination process and rationale to

Achakzai, who indicated that he understood. *Id*. at 31–32. Achakzai explained that his birthdate, recorded as January 1, 1962, is in dispute because of differences in the Afghani and United States calendars and record keeping. *Id*. at 33–34. He testified that he graduated from high school in Afghanistan. *Id*. at 36. The ALJ and Achakzai also discussed Achakzai's service as a translator for the American military in Afghanistan. *Id*. at 37–39. In Afghanistan, Achakzai first worked with a company called Angility[6] where he worked in "telecommunications." *Id*. at 39.

While working in Afghanistan, Achakzai reported that he found himself in danger and that his family suffered retaliation for his work with the United States military:

> From the time was I been to the Army, 24 hours we are -- our life is in danger . . . . during that time is I went with the military Army of the United States and also all the Taliban and also against the Afghanistan government and against American they know about me and also is I lost four of my brothers and also two of them they did like a bomb explosion close to the place that they live in and I lost four of my brothers for that reason because of working with the military.

*Id*. at 40. Achakzai reported that, after returning to the United States, he opened a restaurant called the Kabob Palace in Arizona. *Id*. He testified that his partner cheated him out of all his money, which led him to return to Afghanistan. *Id*. at 40–41. This time, he worked with Torres Advanced Enterprises. *Id*. at 41.

When the ALJ asked Achakzai why he stopped working, Achakzai replied that he was injured and hospitalized in Afghanistan and that, by the time he was released, his team had returned to the United States and no other military contractors were hiring. *Id*. at 42. This was when his depression started. *Id*. Achakzai also testified that watching television increased his depression symptoms. *Id*. He testified that the did not receive any insurance or benefits from his former employers, but that he did enroll in Medicare. *Id*. at 42–43. He was hospitalized a second time, after which his symptoms of weakness, fatigue, and depression got worse. *Id*. at 43. He testified that medication was ineffective. *Id*. at 43.

Achakzai elaborated on the trauma he witnessed in Afghanistan:

---

[6] In Achakzai's motion, the name of the company is spelled "Engility." Pl's Mot. at 3.

> During when I was in Afghanistan with the Army I see a lot of different things and a lot of bombing and killing and doing a lot of bad stuff I see and right now I see on the TV, I don't want to see the TV but . . . every five minutes they come in news and then they show everything. There's a lot of bombing a lot of explosion, people they kill, people they die, children, old, young, everybody. It was bothering me a lot and also I feeling suicidal and depression I have for that.

*Id.* at 43–44. He discussed his cane, which he used to help him walk and sit. *Id.* at 44. He also noted his high blood pressure and high cholesterol. *Id.*

When asked about managing his mental health, Achakzai reported that he took medication which relaxed him and helped him sleep, spent time with his family, and saw a psychiatrist. *Id.* at 45. He detailed his daily activities:

> I don't want to go outside and also I have grandchildren and also I'm so happy with my grandchildren to sit down and also talk and answer to whatever they ask me and I do communication with them and also sometimes they hold my hand and walk inside the house and things like that.

*Id.* at 46. Even though Achakzai used to be a professional chef, he testified that he did not cook for his family but did direct his family while they cooked. *Id.*

The ALJ then moved on to the collection of photographs and letters from Achakzai's time with the army. *Id.* at 47. He asked why Achakzai's ability to speak English had declined since his time as a translator. *Id.* at 47–48. Achakzai replied: "I'm taking a lot of medication . . . [S]ometimes I do translated English to Pashto-Pashto and then back to English and it takes a long time and then I get bothered me for that reason. For that I forget too much." *Id.* at 48.

Achakzai was then questioned by his attorney, who asked him to give more details about what he witnessed in Afghanistan. *Id* at 49. Achakzai explained that he had chronic nightmares about some of the things he saw:

> Before I do nightmare and that time nightmare all the explosion and also dead body and also people, there's another head, there's another leg, or feet or hand doesn't have it. I dream about it.
>
> And also that time I cry too much and screaming too much and my kids they come and they shake me and they say what's going on, move yourself, move to the side and why you're screaming, what's happening. Then I tell them, then I didn't go back to sleep because I'm scared to the same dream.
>
> And also I saw that was bothering me sometime and most of the time

13

United States District Court
Northern District of California

> is I dream about, nightmare, I saw there was Taliban. There was some
> people they take them out all the skin and just that the meat was with
> the bone they have it and also the skin is taken out. Those things I
> saw. Most of the time I dream about this.

*Id*. at 49–50. While medication helped somewhat, he still experienced symptoms of PTSD and depression. *Id*. at 50. He also testified to other stressors in his life, such as his son being wounded in combat or his brother being diagnosed with cancer. *Id*. at 50–51.

The ALJ then heard from Achakzai's son, Tawab, who lives with him. *Id*. at 51–52. When Achakzai's attorney asked for Tawab's impression about his father's condition, Tawab explained that Achakzai isolated himself at home and did not leave the house unless his children accompanied him. *Id*. at 52. It was difficult for the family to engage Achakzai in conversation. *Id*. Tawab reported that Achakzai would often watch the news and had trouble sleeping and socializing with others. *Id*. at 52. Tawab further testified that Achakzai could take care of his basic hygiene, but the family performed other hygiene functions like cutting Achakzai's hair. *Id*. at 52–53. The family also cooked for Achakzai and encouraged him to eat. *Id*. at 53. Tawab also recounted an incident that took place around his sister's engagement where Achakzai "had some type of anxiety attack where he just went motionless and couldn't speak," which led him to the emergency room. *Id*. Tawab testified that tests in the hospital reflected the effects of Achakzai's illness on his ability to care for himself: he was low on potassium, low on magnesium, and dehydrated. *Id*. at 54. According to Tawab, Achakzai found some joy in his grandchildren, even though "he sometimes is hesitant to engage." *Id*. at 55.

The ALJ talked to Tawab about his memories of his father before Achakzai's time in Afghanistan. Tawab explained, "I could see the change in him." *Id*. at 56. Things got worse after Achakzai was hospitalized in Afghanistan. *Id*. at 57. The two also discussed what Achakzai was like prior to his time in Afghanistan. *Id*. at 57. Back then, Achakzai worked in the restaurant business and was well-liked and social. *Id*. Tawab remarked that the difference between his father than to his father now was a "complete 360." *Id*.

The ALJ then turned his attention to Sharon Spaventa, the Vocational Expert ("VE"). *Id*. at 58. Spaventa summarized Achakzai's transferable skills, such as "knowledge of kitchen tools, equipment . . . cooking methods, with assembly and presentation." *Id*. at 60. The VE opined that

14

Achakzai did not have any transferable skills from his time as an interpreter. *Id.* The ALJ offered the following hypothetical:

> [A]ssume a hypothetical individual of the claimant's age and education with the past jobs you described. Further assume that this individual is limited and these are nonexertional limitations only, understand, remember and carry out instructions, limited to perform simple routine tasks, using judgement limited to simple work-related decisions, respond appropriately to supervisors, co-workers and the public limited to occasionally. Dealing with changes in work setting is limited to simple work related to decisions. Can the hypothetical individual perform any of the past jobs you described as actually performed or generally performed in the national economy?

*Id.* at 60–61. The VE testified that such a person would not be able to perform any work, including his past jobs, because of such a person's "[o]nly occasional ability to respond appropriately in the workplace to supervisors and co-workers." *Id.* at 61. She further opined that such an individual could not "perform any other work" for the same reason. *Id.* She testified that her answer would be the same when the ALJ added "absent five days per month" to the hypothetical: "[n]o past work and no other work[.]" *Id.*

After dismissing the VE, the ALJ again spoke to Mr. Achakzai. *Id.* at 62. He asked the translator to interpret the following:

> I had been considering when I was preparing for the hearing requesting a post hearing psychiatric examination. The reason for this is because there is conflicting and some inconclusive medical records of psychiatric and psychological evaluations. However, I do believe that the testimony today of Mr. Jalaluddin Achakzai and Mr. Tawab Achakzai are sufficient to resolve the questions that are raised by the inconsistencies in the psychological reports. So, I believe that I can resolve those differences. It appears that perhaps at the DDS level and with the other examination, that they didn't have the benefit of a full understanding of Mr. Achakzai's mental limitations. . . . As well as the behavioral expressions that are clear both in the records of the file as well as the testimony.

*Id.* at 62. The ALJ ended the hearing by expressing his "hope that [Achakzai] can return in good health to be the loving grandfather and father that [he has] been for many years." *Id.* at 64.

### D. Regulatory Framework for Determining Disability

#### 1. Five-Step Analysis

When a claimant alleges a disability and applies to receive Social Security benefits, the

ALJ evaluates the claim using a sequential five step process. 20 C.F.R. § 404.1520(a)(4). At Step One, the ALJ determines whether the applicant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). Substantial gainful activity is "work activity that involves doing significant physical or mental activities . . . that the claimant does for pay or profit." 20 C.F.R. § 220.141(a)–(b). If the claimant is engaging in such activities, the claimant is not disabled; if not, the evaluation continues at Step Two.

At Step Two, the ALJ considers whether the claimant has a severe and medically determinable impairment. Impairments are severe when "there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not suffer from a severe impairment, he is not disabled; if he does have a severe impairment, the ALJ proceeds to Step Three.

At Step Three, the ALJ turns to the Social Security Administration's listing of severe impairments (the "Listing"). *See* 20 C.F.R. § 404, subpt. P, app. 1. If the claimant's alleged impairment meets one of the entries in the Listing, the claimant is disabled. If not, the ALJ moves to Step Four.

At Step Four, the ALJ assesses the claimant's residual functional capacity, or RFC, to assess whether the claimant could perform his past relevant work. 20 C.F.R. § 404.1520(a)(1). The RFC is a determination of "the most [the claimant] can do despite [the claimant's] limitations." 20 C.F.R. § 404.1520(a)(1). The ALJ considers past relevant work to be "work that [the claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." 20 C.F.R. § 404.11560(b)(1). If the claimant is able to perform past relevant work, he is not disabled; if he is not able to perform such past relevant work, the ALJ continues to Step Five. In the case of claimants who are fifty-five or older, are restricted to sedentary work, have no transferable skills, and have not completed any relevant vocational education, the Commissioner will usually not offer any evidence of work meeting the claimant's RFC and the ALJ will decide disability based on the claimant's ability to perform past work. 20 C.F.R. § 404, subpt. P, app. 2 § 201.00(d).

At the fifth and final step, the burden shifts from the claimant to prove disability to the

16

Commissioner to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite her identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)). If the Commissioner is able to identify such work, then the claimant is not disabled; if not, the claimant is disabled and entitled to benefits. 20 C.F.R. § 404.1520(g)(1).

### 2. Supplemental Regulations for Determining Mental Disability

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process. *See generally* 20 C.F.R. § 404.1520a; *see also Clayton v. Astrue*, No. CIV 09-2282-EFB, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011) (citing *Maier v. Comm'r of Soc. Sec. Admin.*, 154 F.3d 913 (9th Cir. 1998)). First, the Commissioner must determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to four broad functional areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentration, persistence, or maintaining pace; and (4) adapting and managing oneself. 20 C.F.R. § 404.1520a(b)(2), (c). Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1. 20 C.F.R. § 404.1520a(d). If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the evaluation proceeds to Step Four of the general disability inquiry. *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria). *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00. Therefore, any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more

listed mental impairments—is sufficiently severe to render a claimant disabled if it satisfies the general Paragraph B criteria, which require that the claimant suffers at least two of the following: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentration, persistence, or maintaining pace; and (4) adapting and managing oneself. *See id.* A "marked" limitation is one that is "more than moderate but less than extreme" and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* at 12.00C.

This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above. Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."). If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3). This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . . " Social Security Ruling 96-8p, 1996 WL 374184, at *4.

### E. The ALJ's Opinion

After the hearing, the ALJ concluded that Achakzai was not disabled. AR at 9. The ALJ found that Achakzai "had the following medically determinable impairments: anxiety, affective mood, posttraumatic stress disorder, tinnitus, hypertension, and insomnia." *Id.* (citing 20 C.F.R. § 404.1521 *et seq.*). However, at Step Two of the disability analysis, the ALJ found that Achakzai "did not have a severe impairment or combination of impairments." *Id.* at 11. The ALJ opined that Achakzai could perform jobs that required:

> 1. Physical functions such as walking, standing, sitting, lifting,

| | |
|---|---|
| 1 | pushing, pulling, reaching, carrying or handling; |
| | 2. Capacities for seeing, hearing, and speaking; |
| 2 | 3. Understanding, carrying out, and remembering simple instructions; |
| 3 | 4. Responding appropriately to supervision, co-workers, and unusual work situations; and |
| 4 | 5. Dealing with changes in a routine work setting (SSR-85-28). |

*Id*. at 12.  He further concluded that Achakzai "can read, write, speak, and understand English." *Id*. (citing *id*. at 204, 206)

The ALJ explained that he "has read and considered the statements in the claimant's function report dated June 12, 2015, and finds them inconsistent with the severity of the claimant's alleged limitations." *Id*. at 13 (citing *id*. at 224–32).  Specifically, the ALJ noted that Achakzai was able to spend time with his grandson and his children, use a computer, watch television, spend time in his backyard (even if his children had to "force" him), and attend Friday prayers at his mosque. *Id*.  The ALJ noted that Achakzai "described no problems performing personal care.  He stated he was capable of taking out the trash and watering plants. . . . [H]e acknowledged being capable of walking for 30 minutes before needing to rest, 'ok' at following spoken instructions, and 'good' at getting along with authority figures." *Id*.  "Despite his alleged impairments," the ALJ continued, "the claimant has engaged in somewhat normal activity levels. . . . Moreover, some of the physical and mental abilities required to perform these activities are the same as those necessary for obtaining and maintaining employment." *Id*.  The ALJ noted that Achakzai's testimony at the hearing was consistent with his Function Report: he was married, had a driver's license, and was "capable of cooking and preparing meals for his family when he is in a good mood." *Id*.

The ALJ summarized the testimony from Achakzai's son, Tawab and found "the son's testimony only partially consistent with the entire evidence of record and then only to the extent that claimant can do the work described therein." *Id*. at 13 (citing *id*. at 51–58, *id*. at 233–41).  The ALJ noted that, while Tawab described his father's panic attack, hospitalization, and difficulties eating and drinking, he also noted that Achakzai picked up his seventeen-year-old son from school. *Id*.  Overall, the ALJ found Tawab's lay testimony was "not supported by the clinical or diagnostic medical evidence." *Id*. at 14.

19

While the ALJ acknowledged Achakzai's service in Afghanistan, *id.* (citing *id.* at 367–78), he noted that Achakzai's "date last insured (DLI) was June 30, 2017. Thus, if onset of disability cannot be established on or before the DLI, the claim for a period of disability and disability insurance under Title II must be denied. Since this claim is for Title II benefits only, the period of adjudication ends with the DLI." *Id.* He also noted that Achakzai "had no treatment notes available in the record from the alleged onset date of August 1, 2012 until May 15, 2014." *Id.* (citing *id.* at 289–321, 325–78).

After summarizing the record, the ALJ explained that he gave "little weight to the disability statements written by Amrit Saini on May 5, 2017 and May 7, 2017." *Id.* (citing *id.* at 362–66). He opined that "[t]he findings of Dr. Saini are not consistent with the entire evidence of the record." *Id.* at 17. The ALJ interpreted the lack of treatment records between August 1, 2012 and May 15, 2014 as "suggestive that the claimant's mental health impairments during that period were not as severe as alleged." *Id.* He also noted that Achakzai's condition improved over time, particularly with medication. *Id.* The ALJ looked to Dr. Saini's treatment notes in March 2017:

> [T]he claimant was capable of continuing to walk regularly, which the undersigned notes is suggestive the claimant was not isolating at home. He was noted as been capable of driving around in the city and driving to the appointment. . . . He was also reported as being capable of recently traveling to Los Angeles to meet and see his brother who apparently had been diagnosed with cancer, and was under treatment. He was reported as sleeping and eating were "okay." Again, the undersigned notes this is suggestive the claimant's impairments were not as severe as alleged. He had a valid driver's license. He also testified not seeing a doctor and spending time with his family, which he likes being around his grandchildren [sic]. He admitted being capable of cooking and preparing meals for this family when he is in a good mood. Thus, the undersigned has given Dr. Saini's opinions little weight . . . .

*Id.*

The ALJ also gave "little weight" to Dr. Lee's opinion in his December 15, 2015 disability statement, because his findings "are not consistent with the entire evidence of record" and because a lack of treatment notes after November 2015 "is suggestive Dr. Lee was not aware of the claimant's improvement with treatment." *Id.* at 17–18.

The ALJ gave "significant weight" to the opinion of Dr. Spivey, who examined Achakzai

20

on August 18, 2015. *Id.* Dr. Spivey's opinion that Achakzai's limitations were not severe "is supported by Dr. Spivey's benign clinical objective findings." *Id.* He also gave "significant weight" to the opinions of the consultative psychologists. *Id.* (citing *id.* at 66–79, 81–94).

With regard to Achakzai's physical limitations, the ALJ gave "significant weight to the disability statements written by the same Dr. Lee as noted above on December 8, 2014. Dr. Lee was documented as saying 'I don't think he qualifies for disability' in regard to the claimant's asking if he could get disability for his hypertension." *Id.* (internal citations omitted) (citing *id.* at 300). According to the ALJ, Dr. Lee's findings in 2014 "are consistent with the entire evidence of record in regards the claimant's physical impairments." *Id.* at 19. The ALJ repeated the evidence he had summarized previously, again noting that Achakzai did not have treatment records for the time between August 1, 2012 and May 15, 2014, which led him to assume that Achakzai's "physical impairments were not as severe as alleged," and that Achakzai's "longitudinal treatment for his physical impairments was routine and conservative and not as severe as alleged." *Id.*

The ALJ gave "little weight" to the findings of the consultative physicians who reviewed Achakzai's record on initial review and reconsideration. *Id.* (citing 66–79, 81–94). He explained "[t]hese State agency consultants did not have the benefit of considering the additional evidence that was available only after the reconsideration determination including subsequent medical evidence and hearing testimony." *Id.*

Finally, the ALJ assessed Achakzai's limitations under the paragraph B criteria. *Id.* at 20 (citing 20 C.F.R., Part 404, Subpart P, Appendix 1). The ALJ found that Achakzai had mild limitations in all four functional areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself. *Id.* The ALJ noted again that there were no treatment notes before November of 2015, suggesting to the ALJ that Achakzai's condition was not severe. *Id.* He noted Achakzai's "minimal improvement with Paxil" and improvement while working with Dr. Saini, and reiterated the activities that, to his mind, undermined Achakzai's claim of severe symptoms. *Id.* at 20–21. "In sum," he concluded, "the claimant's physical and mental impairments, considered singly and in combination, do not significantly limit the claimant's ability to perform basic work activities.

Thus, the claimant does not have a severe impairment or combination of impairments." *Id.* at 21.

### F.     The Parties' Arguments

Achakzai claims that the ALJ erred by not finding Achakzai's mental impairments were severe at Step Two, erred in how he weighed the opinions of Achakzai's treating and examining medical providers, and that he erred by giving great weight to the opinions of non-examining state physicians. For those reasons, Achakzai asks the Court to remand this matter for an award of benefits.

#### 1.   Severity Determination

Achakzai first argues that the ALJ's determination at Step Two that his PTSD, MDD, and Panic Disorder were not severe impairments is not "clearly established by medical evidence." Pl.'s Mot. at 12 (quoting *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005)). He claims the ALJ's reasoning that Achakzai spent time with family unconvincing because he "lives with his children and grandchildren so by definition he spends time in their company." *Id.* Achakzai also argues that his television watching is a "dysfunctional behavior" symptomatic of his depression, not an interest or activity, because it triggers his PTSD. *Id.* at 13. Achakzai argues that the ALJ claimed that he could cook and drive, but points to places in the record indicating that he did not do those things because of his disabling conditions. *Id.* He also explains that he only goes to religious services when his son accompanies him. *Id.*

Achakzai also takes issue with the ALJ's "suggest[ion] that Mr. Achakzai's psychiatric condition is not severe because he did not have psychiatric treatment between 2012 and 2014," a conclusion Achakzai claims the ALJ reached without asking why he did not seek treatment. *Id.* at 14. Achakzai cites a study from the National Institutes of Health that describes reasons why people suffering from mental illness either delay or do not receive treatment. *Id.* He explains that improvement, one of the ALJ's reasons to find his PTSD nonsevere, "does not mean that the problem has gone away, or that Mr. Achakzai's ability to work is restored." *Id.* at 15.

The Commissioner claims that the ALJ drew reasonable inferences from Achakzai's delay in seeking treatment and the conservative treatment he eventually received. Def.'s Mot. (dkt. 16) at 7–8. He notes that Achakzai did not mention his psychological symptoms even as he sought

treatment for other medical conditions, such as hypertension, high cholesterol, and tinnitus. *Id*. at 7 (citing AR at 287–88, 299, 300). Because Achakzai did not discuss any mental health concerns with his primary care physician until well into their treatment relationship, the ALJ's inference that those concerns were not severe is a reasonable one, according to the Commissioner. *Id*. at 7. In addition, the Commissioner contends that the ALJ was not unreasonable in inferring that, because Achakzai's condition improved with relatively conservative treatment, his condition was not severe. *Id*. at 8. Such reasonable inferences, the Commissioner argues, may not be supplanted by the district court. *Id*. (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005)).

In his Reply, Achakzai reiterates his argument that the evidence the ALJ cited to support his nonseverity decision was inadequate because it was based on the opinions of a non-treating or non-examining physicians evaluating an incomplete record and because the ALJ "cherry-picked and blatantly misconstrued partial quotes from the record of Mr. Achakzai's symptoms and daily activities." Reply (dkt. 17) at 2. He also notes that the VE's response to the ALJ's hypothetical establishes that someone with Achakzai's impairments could not engage in prior work or any gainful employment which, in Achakzai's opinion, "ends the entire discussion." Achakzai argues that the ALJ erred by listing conservative treatment among the reasons he did not find Achakzai's PTSD a severe impairment because the standard to qualify for the alternative to what the ALJ considered conservative treatment, which Achakzai posits is inpatient psychiatric treatment, is higher than the standard for a severe impairment. *Id*. at 5. "Thus, the fact that Mr. Achakzai has not had an inpatient psychiatric hospitalization is not a legitimate reason to not evaluate posttraumatic stress disorder as a severe mental impairment." *Id*.

Achakzai points to *Diedrich v. Berryhill*, 874 F.3d 634, 642 (9th Cir. 2017) and argues that, when it comes to mental health impairments like PTSD which are characterized by ebbs and flows of symptoms, it is improper for an ALJ to infer that symptoms are mild because the record indicates a claimant experienced a period of improvement. *Id*. He asserts that to do so is legal error. *Id*. at 7 (citing *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984)). Finally, he notes that participating in some daily activities is not a clear and convincing reason to find an illness not severe. *Id*. (citing *Diedrich*, 874 F.3d at 642 (9th Cir. 2017); *Cooper v. Bowen*, 815 F.2d 557, 561

(9th Cir. 1987)). Achakzai explains why each of the activities the ALJ mentioned is not indicative of nonsevere symptoms. *Id*. at 8. Overall, he argues:

> [P]erforming these activities is not inconsistent with nightmares of people being skinned alive, or unremitting guilt that because he participated on the side of the U.S. Army his brothers were murdered by the Taliban, anxiety about family members still in Afghanistan, that he startles with loud noise, is triggered by news of Afghanistan or encounters with Afghani persons at mosque or elsewhere, and that he must be pushed to engage in conversation.

*Id*. at 8–9.

Achakzai also argues that the ALJ did not give clear and convincing reasons to find Achakzai's testimony and his son's testimony not credible. *Id*. at 16 (citing *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)). The Commissioner responds by charging that "Plaintiff does not engage with any of the ALJ's analysis, including the ALJ's findings that the testimony was inconsistent with the objective medical evidence; the treatment record of routine, conservative, and successful treatment; the lack of treatment between the alleged onset date and May 2014; and Plaintiff's activities." *Id*. at 13 (citing AR at 13–14). He argues that the reasons the ALJ gave for disregarding the opinions of Achakzai's treating and examining physicians equally apply to his reasons for disregarding the testimony of Achakzai and his son. Achakzai counters by pointing to the ALJ's "boilerplate" language and arguing that the ALJ committed "legal error" because he did not explain which statements he found not credible. Reply at 10–11 (citing *Brown-Hunter v. Colvin*, 806 F. 3d 487, 493 (9th Cir. 2015)).

### 2. Weighing Treating Physicians' Opinions

Achakzai argues that the ALJ did not give specific and legitimate reasons, supported by the evidence, to reject the opinion of Dr. Saini, Achakzai's treating psychiatrist. Pl.'s Mot. at 17 (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). He claims that "[m]ost of these 'reasons' are a re-hash of statements made in connection with the ALJ's discussion of why there was no severe impairment." *Id*. Achakzai reasserts that the lack of treatment notes is not an indication of severity and that improvement does not indicate ability to work. *Id*. at 17–18. He questions whether the ALJ's second reason—minimal improvement with the medication Paxil—is

truly inconsistent with Dr. Saini's findings of severe symptoms. *Id*. at 17. Finally, Achakzai clarifies that while he ultimately did not go to visit his brother in Germany, the planned visit was not inconsistent with Dr. Saini's severity determination because "Mr. Achakzai's brother had cancer, and Mr. Achakzai might travel to Germany despite it being difficult for Mr. Achakzai. Further, Mr. Achakzai might experience nightmares and startle reactions to noise when he was in Germany, just as in America." *Id*. at 18. Achakzai further argues that the ALJ erred by assigning little weight to treating physician Dr. Lee's opinion because, contrary to the ALJ's finding, Dr. Lee's opinion was consistent with the rest of the record. *Id*.

In response, the Commissioner asserts that the ALJ gave legally valid reasons, supported by substantial evidence, for rejecting Dr. Saini and Dr. Lee's opinions. He claims that not only did Achakzai not provide mental health records until April 2015, but that "[t]he absence of any evidence of mental health complaints—particularly when Plaintiff sought treatment for other conditions . . . supported the ALJ's reasonable inference that Plaintiff's symptoms were not serious enough to motivate him to seek treatment." Def.'s Mot. at 7 (citing AR at 17; *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996)). He further argues that the record supports the ALJ's interpretation that "improvement with conservative treatment under Dr. Saini's care . . . contradicted Dr. Saini's opinion asserting sustained, debilitating symptoms and extreme limitations." *Id*. at 8 (citing AR at 362–66). He dismisses Achakzai's argument as "an alternative reading of the evidence to support his disability claim, which is not a basis for reversing the ALJ." *Id*. (citing *Bayliss*, 427 F.3d at 1214 n.1). The Commissioner also argues that the ALJ drew a valid inference—that Dr. Saini's assessment of Achakzai's limitations in interpersonal and psychosocial functioning, coping with stress or daily life, interacting with other people, and managing his well-being are not supported by the record—from Achakzai's reported activities. *Id*. at 8–9 (citing *Morgan v. Comm'r*, 169 F.3d 595, 601-02 (9th Cir. 1999)). In reply, Achakzai notes that the form Dr. Saini completed defined "extreme" in the social security context: that the claimant is not able to function in a given area "independently, appropriately, effectively and on a sustained basis." Reply at 9–10.

The Commissioner further argues that Dr. Lee's opinion is inconsistent with the record in

the same ways that Dr. Saini's is: "Plaintiff's lack of treatment, conservative treatment, improvement with medication, and activities of daily living." Def.'s Mot. at 10. He also notes that, because of the timing of Dr. Lee's opinion, he could not have considered Plaintiff's later improvement under Dr. Saini's care." *Id*. (citing AR at 18). Achakzai describes the Commissioner's argument as being "cherry-picked," and argues that a full review of the record supports Dr. Lee's assessment. Reply at 9.

### 3. Weighing Consultative Physicians' Opinions

Finally, Achakzai argues that the ALJ erred by relying on the opinions of consultative examining physician Dr. Spivey and non-examining reviewing physicians Dr. Kelly and Dr. Patterson. Pl.'s Mot. at 19–20; *see also* AR at 72–73 (opinion of Dr. Kelly); 86–87 (opinion of Dr. Patterson). He argues that the ALJ mischaracterized Dr. Spivey's opinion, which indicated that "she found 'mild to moderate' symptoms of anxiety and made a provisional diagnosis of Anxiety Disorder," because the "finding of mild to moderate symptoms does not equate to no symptoms or to no impairment." *Id*. at 19 (citing AR at 323). In addition, Achakzai notes that Dr. Spivey only saw him once, which means her opinion should be given less weight than the opinion of other physicians with longitudinal treatment relationships under *Lester*, 81 F.3d at 830. Pl.'s Mot. at 20. The Commissioner replies that the ALJ's characterization of Dr. Spivey's opinion was accurate given the entirety of her exam results, which were "generally unremarkable" and found a GAF of 65. Def.'s Mot. at 11 (citing AR at 18, 323).

The Commissioner further argues that the ALJ did not rely on the opinions of nonexamining physicians alone because "the ALJ found them consistent with other evidence including Plaintiff's treatment history and activities." *Id.* at 12 (citing AR at 18, 72–73, 86–87; 20 C.F.R. § 404.1527(e)(2)(i); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The opinions of nontreating or non-examining physicians may also serve as substantial evidence when . . . consistent with independent clinical findings or other evidence.")). The Commissioner further notes that there is no legal requirement for state agency physicians to review the entire longitudinal record. *Id.* at 12. In response, Achakzai notes that Dr. Kelley "specifically pointed to the <u>lack</u> of a psychiatric diagnosis and to the <u>lack</u> of medical evidence pertaining to psychiatric

issues in formulating his opinion," and argues that "it is quite possible that Dr. Kelly's opinion would be different if he had the evidence he felt was lacking." Reply at 3 (citing AR at 73). Achakzai extends his reasoning to Dr. Patterson, who, according to Achakzai, "found since he was reviewing the case not long after Dr. Spivey's CE, that it was not possible for Mr. Achakzai's condition to have worsened, so he simply adopted Dr. Kelly's opinion." *Id.*

### 4. Remand

Achakzai argues that the proper remedy for the ALJ's errors is for the Court to remand for an award of benefits under the Ninth Circuit's "credit-as-true" rule because "if the ALJ were to credit the evidence of record as true, the ALJ would necesssarily [sic] find disability at either at Step III or V." Pl.'s Mot. at 21. Achakzai argues that, had the ALJ continued his disability analysis and properly credited the medical evidence and testimony in the record, he would have found that Achakzai met the criteria for Listing 12.15 for trauma and stressor-related disorders at Step Three. *Id.* According to Achakzai, the record indicates that he suffers from all five of the paragraph A criteria: exposure to actual or threatened death, serious injury, or violence; subsequent involuntary re-experiencing of the traumatic event; avoidance of external reminders of the event; disturbance in mood and behavior; and increases in arousal and reactivity, specifically sleep disturbance. *Id.* at 22. In addition, Achakzai argues, Dr. Lee's physician source statement indicated that Achakzai has extreme limitations in all four paragraph B criteria, findings supported by Dr. Saini's check-box answers and the accompanying letter. *Id.* at 22–23. Achakzai also points to the VE's conclusion that someone with the hypothetical restrictions presented by the ALJ could not work, arguing that those restrictions are supported by the record and compel a conclusion that Achakzai is disabled based on the Step 5 analysis of whether there are jobs available that he could perform. *Id.* at 24.

Finally, Achakzai contends that remanding for further proceedings would constitute an undue burden:

> If this case is remanded for hearing, Mr. Achakzai will have to endure the wait (approximately one year) before a hearing is scheduled. Mr. Achakzai will have to go through the stress of appearing before ALJ Zeidman to describe his symptoms after ALJ Zeidman made clear that he does not believe what Mr. Achakzai describes. Then, Mr. Achakzai

> will have to wait (approximately six months) after hearing before a decision is issued. In my experience of cases before ALJ Zeidman, it is unlikely that he will view things differently on remand, and Mr. Achakzai's case will be appealed once again.

*Id*. at 24.

The Commissioner contends that the credit as true rule does not apply because the ALJ stopped the analysis at Step Two, which requires the Court to remand for further proceedings "to complete the sequential analysis." Def's Mot. at 14 (citing *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) ("Remand for further administrative proceedings is appropriate if enhancement of the record would be useful."); *Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015) ("[T]he decision on disability rests with the ALJ and the Commissioner of the Social Security Administration in the first instance, not with a district court.")). He also argues that remand for further proceedings is warranted because there are conflicts within the medical record. *Id*. (citing *Dominguez v. Colvin*, 808 F.3d 403, 409 (9th Cir. 2016); *Treichler v. Comm'r of SSA*, 775 F.3d 1090, 1105–06 (9th Cir. 2014)). The Commissioner asserts there is doubt about Achakzai's claim, such as the possibility that "Plaintiff left work for reasons other than his alleged impairments—his restaurant failed." *Id*. According to the Commissioner, this, too, would require the Court to remand for further proceedings if the Court determines that the ALJ erred. *Id*. (citing *Garrison v. Colvin*, 759 F.3d 995, 1021 (9th Cir. 2014)).

## III. ANALYSIS

### A. Legal Standard

District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are free of legal error and supported by "substantial evidence." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record. *Richardson v. Perales*, 402 U.S. 389, 401. (1971). "'Substantial evidence' means more than a mere scintilla," *id*., but "less than preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.

1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655. (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

The legal standard to reject a claimant's subjective symptom testimony is "specific, clear and convincing reasons." *Garrison*, 759 F.3d at 1014–15. The legal standard for giving less than "great weight" to the opinion of a treating physician when that opinion is contradicted by the report of another examining physician is "specific and legitimate reasons." *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)). The legal standard to support a severity determination at Step Two of the disability analysis is "substantial evidence." *Webb*, 433 F.3d at 687. If the ALJ failed to meet these standards in his opinion, the court may find legal and reversible error. *See Benitez*, 573 F.2d at 655. The Court may then remand for further proceedings or for a calculation of benefits. *See Garrison*, 759 F.3d at 1019–21.

**B.     The ALJ Erred in Finding Achakzai's Testimony Only Partially Credible**

Many of Achakzai's arguments stem from his contention that the ALJ erroneously found his testimony not credible. "The ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)). To make such a determination, the ALJ must first determine "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Treichler*, 775 F.3d at 1102 (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). Then, when there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 128. These reasons must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v.*

29

*Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). "General findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (internal quotation marks omitted).

Here, there was no affirmative evidence of malingering, and the ALJ recognized that Achakzai's "medically determinable impairments could have been reasonably expected to produce the alleged symptoms." AR at 14. Therefore, the ALJ erred by failing to provide specific, clear, and convincing reasons, supported by substantial evidence in the record, to reject Achakzai's testimony. *Smolen*, 80 F.3d at 128.

At the hearing, Achakzai testified that his depression, anxiety, and PTSD symptoms were severe and persistent to the extent that they prevented him from working. AR at 42–51 (testifying that his symptoms were what made him stop working and that his symptoms affected his daily life). In his self-administered function report, Achakzai explained that his symptoms impacted his ability to concentrate, be motivated, and interact with others. AR at 224–32. The ALJ rejected the testimony from both the hearing and the report as not credible because it was not consistent with the objective medical evidence in the record and because, with respect to Achakzai's daily activities, his "ability to participate in such activities undermined the claimant's assertion of disabling functional limitations." *Id*. at 13. Neither of these reasons are clear and convincing.

### 1. The ALJ Did Not Provide Specific Reasons to Support His Contention that Achakzai's Testimony Conflicted with the Objective Medical Evidence

The ALJ's first reason to discredit Achakzai's testimony was that it was "not consistent with the objective medical evidence." AR at 13. However, he did not elaborate as to which testimony was inconsistent with the medical record. *See id*. at 13–14 (listing activities and asserting, without explanation, that Achakzai's testimony conflicted with the objective medical evidence). This finding is too general and does not "permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas*, 278 F.3d at 958. The Ninth Circuit has ruled that "[a]n ALJ's 'vague allegation' that a claimant's testimony is 'not consistent with the objective medical evidence,' without any 'specific findings in support' of that conclusion is insufficient." *Treichler*, 775 F.3d at 1103 (quoting *Vasquez v. Astrue*, 572 F.3d 586, 592 (9th Cir. 2009)). When, as here, the ALJ offers only an assertion that the claimant's testimony is

inconsistent with the medical record, he has erred. *Id.* This reason is not specific, let alone clear and convincing.

### 2. Substantial Evidence Does Not Support the ALJ's Use of Achakzai's Reported Activities to Undermine His Credibility

The Ninth Circuit recognizes two situations in which an ALJ may use a claimant's reported daily activities as evidence to discredit his testimony. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2017). The first is to prove that "a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (emphasis omitted). To invoke a claimant's activities for this purpose "[t]he ALJ must make 'specific findings relating to [the daily] activities' and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination." *Orn*, 495 F.3d at 639 (quoting *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)). The second permissible use is to show that the claimant's statements contradict the record itself. *Fair*, 885 F.2d at 603. Here, the ALJ has not provided substantial evidence to support either of these uses.

First, the ALJ did not explain which of the activities he cited would be transferable to a work setting. The Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain,[7] because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016; *see also Vertigan v. Halter*, 260 F.3d 1044, 1049–50 (9th Cir. 2001) ("The mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from [his] credibility as to [his] overall disability. One does not need to be 'utterly incapacitated' in order to be disabled."). The mere fact that Achakzai engaged in some activities does not itself contradict his testimony that his symptoms were persistent and severe. While the ALJ did add that "some of the

---

[7] Although the *Garrison* court addressed this principle in the context of the physical pain symptoms at issue in that case, this Court finds the same reasoning applicable to the symptoms that Achakzai asserts here.

physical and mental abilities required in order to perform these activities are the same as those necessary for obtaining and maintaining employment," AR at 13, he did not "make 'specific findings relating to [the daily] activities'" or establish that Achakzai spent a substantial amount of his day engaged in these activities. *Cf. Orn*, 495 F.3d at 639 (quoting *Burch*, 400 F.3d at 681). Accordingly, the ALJ's assertion that Achakzai's general activity level was inconsistent with his symptom testimony is not a legitimate reason, supported by substantial evidence, to find Achakzai's testimony less than fully credible.

Nor do any of the activities the ALJ mentioned factually contradict Achakzai's testimony at the hearing or in his functional report. For example, the ALJ mischaracterized Achakzai's activities with regard to cooking. The ALJ wrote that Achakzai "admitted being capable of cooking and preparing meals for his family when he is in a good mood.'" AR at 13. However, Achakzai testified not that he cooked meals but that he directed his family as to "what they should be cooking and how they should be cooking when [he] was in the good mood." *Id.* at 46. This hearing testimony is consistent with his statement in the function report that he does not cook his own meals, *id.* at 226, and consistent with the rest of the record. *See id.* at 235 (third-party report from son Tawab Achakzai that Achakzai does not prepare his own meals); *id.* at 323 (Achakzai reporting to Dr. Spivey that he could not cook for himself).

In addition, the ALJ concluded that Achakzai's ability to take out the trash, work on plants in the yard, and generally go outside was inconsistent with the claimed severity of his depression and PTSD symptoms. *Id.* While Achakzai did testify that he did not "want to go outside," *id.* at 46, this testimony is not inconsistent with the rest of the record. His son Tawab explained that Achakzai went outside "[r]arely" and that he had to "bug him to go out." *Id.* at 236.

The ALJ noted that Achakzai acknowledged having only mild impairments in certain respects—for example, that he was "'ok' at following spoken instructions"—but did not explain why those abilities would contradict his testimony regarding more severe symptoms. *See id.* at 13.

\* \* \*

The ALJ did not make sufficiently specific findings for the Court to conclude that Achakzai's daily activities could be transferred to a work setting. Further, substantial evidence in

32

the record does not support the ALJ's assertion that Achakzai's testimony was inconsistent with the objective medical record or that his reported daily activities undermined his testimony or his credibility. Therefore, the ALJ erred by not providing clear and convincing reasons, supported by substantial evidence, to reject Achakzai's symptom testimony.

## C. The ALJ's Reason to Reject Tawab Achakzai's Testimony Is Not Germane

The ALJ further erred when he failed to provide sufficient reasons for rejecting Tawab Achakzai's testimony as not credible. "[T]he ALJ may expressly disregard lay testimony if the ALJ 'gives reasons germane to each witness for doing so.'" *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001)). The ALJ's reason for discounting Tawab Achakzai's testimony was that "his statements are not supported by the clinical or diagnostic medical evidence." AR at 14. The Ninth Circuit has held that an ALJ errs when she does not "identify which testimony she found not credible and why." *Brown-Hunter*, 806 F.3d at 489. An ALJ must "tie the reasoning of their credibility determinations to the particular witnesses whose testimony they reject." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009); *see also Stephens v. Colvin*, No. 13-CV-05156-RS, 2014 WL 6982680, at *7 (N.D. Cal. Dec. 9, 2014) ("*Valentine* is thus better understood as allowing ALJs to reject lay witness testimony only with express reference to reasons already put forth to reject similar testimony"). The ALJ did not provide a germane reason tied to Tawab's testimony, but rather offered a vague and general conclusion that did not point to any specific inconsistencies between Tawab Achakzai's testimony and the record. *See Diedrich*, 874 F.3d at 640 ("A lack of support from medical records is not a germane reason to give little weight' to [a layperson's] observations."). Therefore, he erred.

## D. The ALJ's Nonseverity Finding Is Not Supported by Substantial Evidence

Achakzai further argues that the ALJ erred when he found that Achakzai's mental impairments due to major depressive disorder, anxiety, and PTSD were not severe at Step Two. Because a lack of severity is not clearly established by the medical record, the Court agrees.

An impairment is considered severe when it significantly limits a person's "physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At Step Two of the disability

determination, "[a]n impairment or combination of impairments may be found 'not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb*, 433 F.3d at 686 (quoting *Smolen*, 80 F.3d at 1290 (internal quotation marks omitted)). The severity determination at Step Two is "a de minimis screening device [used] to dispose of groundless claims." *Smolen*, 80 F.3d at 1290. "[A]n ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb*, 433 F.3d at 687 (citing SSR 85-28). In evaluating an ALJ's severity determination, the district court "must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the claimant] did not have a medically severe impairment or combination of impairments." *Webb*, 433 F.3d at 687.

Here, the ALJ ignored the larger record of medical evidence which, as a whole, does not clearly establish that Achakzai's impairments were not severe. Accordingly, the ALJ's severity determination is not supported by substantial evidence and constitutes legal error.

### 1. The ALJ Did Not Consider Evidence That Achakzai's Impairments Were Severe and Kept Him from Working

First, the ALJ did not acknowledge that Achakzai's doctor and psychiatrist had diagnosed him with PTSD, depression, and anxiety. *See* AR at 304 (Dr. Lee adding "Pt has a component of PTSD" to his diagnosis of insomnia); *id.* at 329 (Dr. Lee diagnosing Achakzai with depression and anxiety); *id.* at 361 (Dr. Saini diagnosing Achakzai with "Major depressive disorder, recurrent episode, moderate degree," "Post-traumatic stress disorder," and "Panic disorder"). Courts in this circuit have held that, when a claimant alleges a mental illness, the diagnosis of a medical professional is enough to pass the Step Two severity inquiry. *See Orellana v. Astrue*, 547 F. Supp. 2d 1169, 1173 (E.D. Wash. 2008) ("[F]or purposes of a step two finding, where there is no inconsistency between a claimant's complaints and the diagnoses of record from examining and treating doctors, a claim cannot be found 'groundless' under the de minimis standard of step two." (citing *Webb*, 433 F.3d at 688)).

### 2. Substantial Evidence Does Not Support the ALJ's Conclusion Regarding Achakzai's Activities

In finding that Achakzai did not have a severe impairment, the ALJ opined that the record did not support the degree of severity Achakzai alleged because of Achakzai's daily activities, including "spending time with his grandson, using a computer, and watching television." AR at 13. He also visited the mosque to pray. *Id.* However, the record indicates that Achakzai performed these activities in a manner consistent with his claimed limitations: he went to the mosque on Fridays, but only because his son accompanied him, and he did not interact with other worshippers. *Id.* at 52. When he watched television, he had an emotional reaction when his native country was mentioned. *Id.* at 43. He spent time with his family because his children made the effort to be around him in the home they share; they had to "pry" him out of the house to engage in family activities. *Id.* at 55.[8] Accordingly, the assertion that Achakzai's impairments were not severe because of his reported activities is not clearly established medical evidence on which the ALJ may base his severity determination.

### 3. Conservative Treatment is Not Supported by the Record

Finally, the ALJ claimed that Achakzai's "routine and conservative treatment" indicated that his symptoms were not severe. AR at 14. This finding is not supported by the record. Courts in this circuit have found that, when a claimant is taking "several psychiatric medications at significant doses," the record did not support an ALJ's characterization of treatment as conservative. *See Callahan v. Berryhill*, No. EDCV 17-1247-KS, 2018 WL 2446649, at *4 (C.D. Cal. May 29, 2018) (citing cases). Here, Achakzai was taking three medications for his depression, PTSD, and panic disorders: 100 mg of Zoloft, .5 mg of Klonopin, and 40 mg of Paxil.[9]

---

[8] The ALJ's conclusion that Achakzai has no severe impairments is also not consistent with the hypothetical limitations that the ALJ presented to the VE, to which the VE responded that no work would be available. The ALJ posed no hypothetical of lesser restrictions that would allow work. Although the ALJ apparently reconsidered Achakzai's limitations at some point between the hearing and issuing his decision, it is not at all clear how his view of Achakzai's symptoms shifted dramatically from restrictions that would preclude all work to not even meeting the de minimis standard of a "severe impairment" at Step Two.

[9] Achakzai also takes Prazosin for his hypertension. AR at 361. Studies have shown a link between hypertension and anxiety. *See* Wenpeng Cai, et. al., *Association between anxiety and hypertension: a systematic review and meta-analysis of epidemiological studies*, 11

AR at 361.  Further, Achakzai was hospitalized after a near-fainting incident brought on by

hypertension, which his son and daughter described as being related to his anxiety.  *See id*. at 53,

342.  Therefore, the ALJ's assertion that Achakzai's treatment was conservative is not supported

by the medical evidence and does not support the ALJ's severity determination.

### E.    The ALJ Erred in Weighing the Opinion Evidence

Finally, Achakzai argues that the ALJ erred when he disregarded the opinions of

Achakzai's treating physicians Dr. Saini and Dr. Lee because he did not provide specific and

legitimate reasons, supported by substantial evidence, for doing so.  The Court agrees.

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

(examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

physicians)."  *Lester*, 81 F.3d at 830.  The Ninth Circuit "afford[s] greater weight to a treating

physician's opinion because 'he is employed to cure and has a greater opportunity to know and

observe the patient as an individual.'"  *Magallanes*, 881 F.2d at 751 (quoting *Sprague v. Bowen*,

812 F.2d 1226, 1230 (9th Cir. 1987)).  When, as here, the treating physician's opinion is

contradicted by other opinions in the record, the ALJ must provide specific and legitimate reasons

supported by substantial evidence before discounting that opinion.  *Murray*, 722 F.2d at 502 (9th

Cir. 1983).  The reasons the ALJ provided were specific, but they were not legitimate or supported

by substantial evidence.  Accordingly, the ALJ erred.

### 1.    The ALJ's Interpretation of the Lack of Treatment Notes is Unsupported

The inference that Achakzai delayed seeking psychiatric treatment because his symptoms

are not severe is not supported by the record; consequently, the ALJ erred by citing it as a reason

to give little weight to Dr. Saini's testimony.  The record indicates that culture and language

prevented Achakzai from seeking psychiatric help sooner: Dr. Saini wrote that Achakzai had

---

NEUROPSYCHIATR. DIS. & TREAT. 1121 (2015) (reviewing studies and concluding that "there is an
association between anxiety and increased risk of hypertension.").  This medication can arguably
be included in the "several medications" that Achakzai takes to manage his psychiatric conditions.
Whether Achakzai's hypertension medication is included in this analysis is not relevant to the
outcome of the present motions, however, because Achakzai's Zoloft, Klonopin, and Paxil are
sufficient to show more than conservative treatment.

United States District Court
Northern District of California

"limited insight due to cultural reservations into mental illness." AR at 344. Dr. Saini also felt that Achakzai would benefit from "culture sensitive psychotherapy" and referred him to a Farsi-speaking therapist. *Id*. at 345–46. In addition, Achakzai sought help from his physician, Dr. Lee, who prescribed medication for his insomnia and depression, which suggests that Achakzai was concerned enough about his condition discuss it with his medical doctor even as he wrestled with cultural stigma around psychiatric treatment. See *id*. at 304 ("Pt has component of PTSD. Was in Afghan army. Wakes up thinking about it."). Finally, Achakzai testified at the administrative hearing that he did not have insurance or access to medical care after he returned from Afghanistan in 2012, which was when he alleges his disability began. *Id*. at 42–43. The ALJ did not consider any of the above evidence in evaluating that Achakzai's delay in treatment, nor did he ask Achakzai why there were no medical records before May of 2014 or why he did not seek treatment until then. Accordingly, this reason is not legitimate.

### 2. Periods of Improvement Are Not a Legitimate Reason

The ALJ's second reason, that Achakzai's improvement with medication undermines Dr. Saini's testimony, is not a legitimate reason supported by the record. Periods of improvement do not negate a finding of disability. The Ninth Circuit has held that, when evaluating nonexertional impairments based on mental illness, the ALJ "must interpret reports of improvement . . . with an understanding of the patient's overall well-being and the nature of her symptoms." *Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2016) (quoting *Garrison*, 759 F.3d at 1017). The ALJ did not situate the instances of improvement within the larger context of Achakzai's condition as described in the record. For example, Achakzai suffered an "anxiety attack" in February of 2017, which left him hospitalized for three days. AR at 53.[10] This incident occurred during a period of relative improvement. *See id*. at 344 (reporting to Dr. Saini "[o]verall I have been doing good" and "reasonable response to prescribed medication" on January 30, 2017[11]).

---

[10] Dr. Santos noted that the cause of Achakzai's episode was "unclear," AR at 378, but indicated that Achakzai's blood pressure fluctuation was "of note," *id*. at 376. Hypertension (or high blood pressure) is linked to anxiety. *See* Cai, et. al., *supra* note 11.
[11] This treatment note is dated "03/05/2017," but an addendum reads "Please consider this progress note as of service on 1/30/2017." AR at 344–45.

In addition, Achakzai's limited improvement is consistent with the record as a whole and supports Dr. Saini's overall opinion and the opinion of Dr. Lee, Achakzai's treating physician. Dr. Lee indicated that Achakzai would have periods of improvement and periods of intensifying symptoms. *Id.* at 335 (Dr. Lee answering "yes" when asked if Achakzai's impairments were "likely to produce 'good days' and 'bad days'"). Dr. Saini also characterized Achakzai's improvement as "non-sustained," *id.* at 363, and his treatment response as subject to "frequent relapses." *Id.* at 364. The event in February is an example of those opinions being supported by the record, as well as an illustration of the Ninth Circuit's observation in *Holohan v. Massanari*: "That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect" him. 246 F.3d 1195, 1205 (9th Cir. 2001).

Because the record supports Dr. Saini's assertion that Achakzai's improvement is periodic and "non-sustained," AR at 365, the ALJ's finding that Achakzai's improvement negated Dr. Saini's opinion is not supported by substantial evidence.

### 3. The ALJ Did Not Provide Valid and Specific Reasons for Rejecting Dr. Lee's Functional Capacity Opinion

The ALJ dismissed the Functional Capacity Questionnaire of Dr. Lee, AR at 336–37, because it was "not consistent with the entire evidence of record" and "there were no treatment notes in the record past November 2015 from Dr. Lee, which the [ALJ considered] suggestive Dr. Lee was not aware of the claimant's improvement with treatment." *Id.* at 18. As discussed above, the record does not support a finding that Achakzai had substantially improved after November of 2015 and the inference the ALJ drew from the lack of treatment notes is not legitimate.

The ALJ's second reason—that Dr. Lee's opinion as to Achakzai's mental impairments[12] were not consistent with the record—is also not supported by substantial evidence. Dr. Lee's questionnaire opinion is consistent with Dr. Saini's assessment on May 7, 2015, which was

---

[12] The ALJ gave "significant weight" to Dr. Lee's treatment notes and opinions as to Achakzai's physical impairments. AR at 19. As discussed above, Achakzai does not contest the ALJ's findings as to his physical limitations.

conducted after November of 2015. *Compare id*. at 335 (Dr. Lee finding that Achakzai would be absent from work more than four days per month) *with id*. at 366 (finding the same); *id*. at 336 (Dr. Lee finding Achakzai "Unable to meet competitive standards" with regard to dealing with normal work stress and sustaining an ordinary routine without supervision) *with id*. at 365 (Dr. Saini finding extreme limitations in concentrating, persisting at tasks, and maintaining pace and ability to regulate emotions, control behavior, and manage well-being at work).

Because neither of the ALJ's reasons for discounting Dr. Lee's or Dr. Saini's opinions are supported by substantial evidence, the ALJ did not provide clear and convincing reasons for rejecting that opinion and therefore erred.

### F.    Remedy

The proper remedy for the ALJ's legal errors is to remand the case for further administrative proceedings. "When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler*, 775 F.3d at 1099). This is because "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the testimony as true." *Treichler*, 775 F.3d at 1106. In appropriate circumstances, however, the court may order an immediate award of benefits under the Ninth Circuit's "credit-as-true" rule. *Leon*, 880 F.3d at 1045 (citing *Garrison*, 759 F.3d at 1019).

The district court may remand to the ALJ to calculate and award benefits when: (1) "the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no] outstanding issues that must be resolved before a disability determination can be made" and "further administrative proceedings would [not] be useful"; and (3) "on the record taken as a whole, there is no doubt as to disability." *Leon*, 880 F.3d at 1045 (citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that a district court abused its discretion in declining to apply the "credit as true" rule to an appropriate case). The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act,"

*Garrison*, 759 F.3d at 1021, when "there is a need to resolve conflicts and ambiguities," *Treichler*, 775 F.3d at 1101, or when there is ambiguity about when the claimant's disability began that is not solved by the record credited as true. *See Dominquez v. Colvin*, 808 F.3d 403, 409 (9th Cir. 2015). Here, there are ambiguities in the record that further proceedings would be useful to reconcile. One such ambiguity is the precise date when Achakzai's disability began, particularly in light of the lack of treatment records from the first years of the alleged period of disability. The credit-as-true rule therefore does not apply, and the Court remands for further administrative proceedings.

To the extent such evidence exists, Achakzai should submit additional evidence documenting the onset of his alleged disability. While the record strongly suggests that Achakzai was disabled for at least some portion of the period at issue, there is insufficient evidence at this time for the Court to conclude that Achakzai's disability began on August 1, 2012 as alleged. At the administrative hearing, Achakzai spoke generally about his disability beginning sometime time in 2012. *Id*. at 41–43. He further testified that he stopped working not only because of the severity of his symptoms but also because his company left Afghanistan and no other companies were hiring translators. *Id*. at 42. In addition, Achakzai has not submitted medical records that reflect his condition prior to May 15, 2014; there is not any evidence in the record about the severity of his condition from the alleged onset date through mid-May almost two years later. The treatment notes in the record refer only to the year of Achakzai's return, not the precise date, and do not indicate when Achakzai's disabling symptoms began. See *id*. at 322 (Dr. Spivey nothing that Achakzai "has not worked since 2012," but not precisely when or why); 360 (Dr. Saini documenting Achakzai's return as occurring in 2012). While this lack of records does not preclude Achakzai from showing a severe impairment during portions of the period at issue, it complicates the task of determining the onset date of the alleged disability. Given the lack of evidence establishing the onset date of Achakzai's disabling condition, further administrative proceedings are required and the credit-as-true rule does not apply.

The record might also benefit from additional psychological evaluation of Achakzai to assess his condition. At the hearing, the ALJ told Achakzai, "I had been considering when I was preparing for the hearing requesting a post hearing psychiatric examination. The reason for this is

40

because there is conflicting and some inconclusive medical records of psychiatric and psychological evaluations." AR at 62. In context, the ALJ appears to have believed at the time that Achakzai was disabled. Assuming, however, that the ALJ believed—consistent with his later decision—that an examination was unnecessary because Achakzai clearly had no severe impairment, his consideration of ordering another evaluation suggests that further evidence might be necessary to determine the nature of Achakzai's impairments. Such an examination could help resolve the conflicts in the record, such as the precise degrees of impairment identified by Dr. Spivey, Dr. Lee, and Dr. Saini and provide a contemporaneous account of Achakzai's symptoms. If, on remand, the Commissioner does not find the existing evidence sufficient to establish disability, the Commissioner should consider ordering a further psychological evaluation as contemplated at the administrative hearing.

## IV.     CONCLUSION

For the reasons discussed above, Achakzai's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED to the Commissioner for further proceedings consistent with this order. The Clerk is instructed to enter a judgment accordingly and to close the file.

**IT IS SO ORDERED.**

Dated: March 25, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge